# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-1003V
UNPUBLISHED

| | |
|---|---|
| JENNIFER HUNT,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: June 16, 2022<br><br>Special Processing Unit (SPU);<br>Entitlement to Compensation; Ruling<br>on the Record; Findings of Fact;<br>Onset; Influenza (Flu) Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA) |

*Leah VaSahnja Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.

*Kyle Edward Pozza*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On July 15, 2019, Jennifer Hunt filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on September 28, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below I find that Petitioner is entitled to compensation, and I award **$95,000.00** in damages, representing compensation for actual pain and suffering, and **$7,193.44** representing out-of-pocket unreimbursed expenses.

I. **Relevant Procedural History**

After the initial status conference on September 18, 20219, Petitioner filed additional medical records and a statement of completion on October 17, 2019. ECF Nos. 11, 12. On May 18, 2020, Respondent filed a status report stating that a preliminary review of the case did not identify any missing records. ECF No. 17. Respondent also noted that certain fact issues may require additional development, including a delay in seeking treatment and questions regarding the onset of Petitioner's injury. By November 18, 2020, however, Respondent indicated a willingness to enter into settlement negotiations (ECF No. 27) – although the parties later informed me in May 2021 that those discussions were unsuccessful. ECF No. 34.

Petitioner accordingly filed a motion for a ruling on the record regarding entitlement and damages on June 28, 2021. Petitioner's Motion for a Ruling on Entitlement and a Determination of Damages ("Mot."), ECF No. 37. Petitioner argues therein that she meets the table definition of a SIRVA, and requests an award of $160,000.00 for actual pain and suffering, plus $7,193.44 for unreimbursed out-of-pocket expenses. Mot. at 15-16.

Respondent opposed the motion on September 21, 2021. Respondent's Response to Petitioner's Motion for Ruling on the Record ("Opp."), ECF No. 41. Respondent argues that Petitioner failed to establish a Table claim, because there was no reference to an adverse reaction on the date of Petitioner's vaccination, and because she did not complain of shoulder pain during a visit with her primary care provider six days later. Opp. at 7. Respondent proposed an award of $90,000.00 for pain and suffering if entitlement was found in favor of Petitioner. Opp. at 12.[3]

Petitioner filed a reply on October 12, 2021, addressing Respondent's arguments. Petitioner's Reply to Respondent's Response to Petitioner's Motion for a Ruling on Entitlement and a Determination of Damages ("Reply"), ECF No. 42.

Neither party addressed Petitioner's claim for out-of-pocket expenses, and Petitioner was ordered to file support for this amount by May 13, 2022. ECF No. 43. Petitioner filed Exhibit 18, Petitioner's Unreimbursable Expenses, on May 13, 2022. ECF No. 44. This matter is now ripe for resolution.

---

[3] Respondent does not address Petitioner's out-of-pocket expenses.

## II.     Petitioner's Medical Records

Petitioner received the flu vaccine on September 28, 2018, in her left shoulder at Davis Medical Group Family Medicine. Ex. 1. On October 4, 2018, Petitioner followed up with Michael Salter, M.D., to discuss lab results. Ex. 2 at 9-13. There is no reference to shoulder pain complaints set forth in that record.

Petitioner returned to Davis Medical Group two weeks later, on October 16, 2018, with complaints that she was "*still* having arm soreness (Lt. arm) from flu vaccine received on 9/28/18." Ex. 2 at 7 (emphasis added). An examination noted that Petitioner had tenderness, limited range of motion, and pain in her left shoulder. *Id.* at 8. She also reported that she had a flu shot in her left shoulder three weeks earlier and "[i]nitially had pain in shoulder from injection, now pain on movement as well as weakness in shoulder." *Id.* She was diagnosed with inflammation of the rotator cuff tendon and prescribed a Medrol Dosepak.

October 25, 2018, Petitioner returned to Dr. Salter for "worsening left arm pain." Ex. 2 at 5. An examination indicated Petitioner had reduced strength, tenderness, limited range of motion, and pain in her left shoulder. *Id.* at 6. A CT scan was performed on November 14, 2018, that showed "[s]mall erosion at the distal clavicle at the acromioclavicular joint." Ex. 4 at 6.

On November 27, 2018, Petitioner was seen by Dr. Dale Rader, an orthopedic surgeon, due to continued left shoulder pain. Ex. 5 at 11. Petitioner reported trouble with her left shoulder and limited range of motion since receiving a flu vaccine two months earlier, and that she "noticed a difference immediately after getting her flu shot." *Id.* The record also notes that Petitioner's left shoulder pain and stiffness "began after she received a flu shot 2 months ago." *Id.* at 12. Petitioner was diagnosed with impingement syndrome and received a corticosteroid injection. *Id.* at 13.

Petitioner had an initial physical therapy evaluation on December 6, 2018. She reported that she had a flu shot in September of 2018, and "had pain increase from this and the pain has not gone away." Ex. 4 at 23. An examination indicated she had reduced strength. *Id.* at 23, 15-17; 16. Petitioner reported pain was "8+ prior to the cortisone injection last week" but at that time was 2-3 at worst. *Id.* at 24. The physical therapy noted that Petitioner's symptoms were consistent with subdeltoid bursitis. *Id.* at 35.

Petitioner attended ten physical therapy sessions between December 6, 2018, and January 24, 2019. Ex. 4 at 27. She continued to report varied pain levels throughout this period from between 5-6 and 0 out of 10. *See id.* at 41 (physical therapy record from

December 27, 2018, reporting pain as 5-6 out of 10); *id.* at 30 (physical therapy record from January 16, 2019, reporting pain as 0 out of 10). On January 24, 2019, her pain was reported as 3 out of 10 after her last session. *Id.* at 27.

Petitioner saw Dr. Rader again on January 8, 2019. Ex. 5 at 8-10. At that time, she continued to show limited range of motion and tenderness in her left shoulder, but stated she noticed significant improvement after the earlier steroid injection and physical therapy. *Id.* at 10. At a follow-up appointment on February 5, 2019, with Dr. Rader Petitioner continued to complain of shoulder pain and received a second cortisone injection. *Id.* at 7. Another follow-up with Dr. Rader occurred on March 1, 2019. Petitioner reported that she had relief from the steroid injection and the pain "has not returned." *Id.* at 4. However, she still had pain with range of motion and lifting. *Id.*

On April 16, 2018, Petitioner again reported continued pain despite conservative measures, and decided to proceed with surgical intervention. Ex. 6 at 9. Petitioner underwent left shoulder arthroscopy surgery on May 16, 2019, that involved limited debridement, subacromial decompression, partial acromioplasty, and coracoacromial release of the left side. *Id.* at 11.

On June 18, 2019, Petitioner began a second physical therapy course. Ex. 6 at 3. At that time, she noted that she was improving, and rated her pain as 1 or 2 out of 10. Ex. *Id.* Petitioner exhibited full range of motion with soreness. She also showed full strength with some mild discomfort at the end range of impingement and crossover. *Id.*

Petitioner attended nine physical therapy sessions between June 6, 2019, and July 30, 2019. Ex. 8 at 1-25. During that period, she reported pain levels at 0-3 out of 10. *Id.* at 18 (physical therapy record from June 13, 2019, reporting pain as 3 out of 10); *id.* at 12 (physical therapy record from June 27, 2019, reporting pain as 0 out of 10). Petitioner was discharged from physical therapy on July 30, 2019. *Id.* at 2. At that time, she reported range of motion was functional and strength improved, however her shoulder was still sore "when she first wakes up in the morning." *Id.* at 2.

On September 9, 2019, Petitioner saw Dr. Rader for a four-month post-op follow-up. Ex. 10 at 1-3. Petitioner reported she still experienced constant pain, rated as 5 out of 10. *Id.* at 2. She showed full range of motion received another cortisone injection. *Id.* at 3. Petitioner again complained of shoulder pain to Dr. Rader on October 21, 2019, although she stated the steroid injection on her last visit "really helped with her pain." Ex. 12 at 2.

4

Petitioner saw Dr. Scott Brandon on November 6, 2019, for a second opinion regarding her shoulder. Ex. 13 at 3. Petitioner continued to complain of shoulder pain, and Dr. Brandon diagnosed her with left shoulder adhesive capsulitis after an arthroscopic debridement. *Id.* at 4. He recommended an MRI, which was performed on November 18, 2019. The MRI showed signs of adhesive capsulitis and potentially a labrum tear, along with trace subacromial subdeltoid bursitis. Ex. 14 at 1-2.

Petitioner saw Dr. Brandon again on November 27, 2019, with complaints of shoulder pain that was "fairly significant" and woke her at night. Ex. 13 at 2. An exam showed full range of motion to about 130 degrees. She was diagnosed with adhesive capsulitis and received a steroid injection. *Id.* On December 18, 2019, Petitioner reported a 50% improvement and was told to return as needed for any symptoms. *Id.* at 1.

Petitioner continued to complain of shoulder discomfort on March 15, 2021, however the "excruciating pain that she had and profound stiffness has abated". Ex. 17 at 1. She received another steroid injection at that time. *Id.*

Petitioner last saw Dr. Brandon on April 7, 2021. Ex. 17 at 2. At that time, she reported she "still has a little bit of a catch and pain, but she is happy with her clinical progress." Upon examination, she showed full strength but some pain with internal rotation.

### III.    Affidavit Evidence

Petitioner submitted an affidavit in support of her claim on July 26, 2019. Ex. 7. Petitioner stated that she received a flu shot in Dr. Michael Salter's office on September 28, 2018, and that the injection itself was painful. Ex. 7 at 1. She also described her course of treatment, and how her injury impacted her life, and the emotional and financial toll she has had to endure. Ex. 7 at 1-2.

Petitioner submitted a second affidavit on May 28, 2020. Ex. 15. In it, she states that the vaccination on September 28, 2018, in Dr. Michael Salter's office. Petitioner also stated that the shot hurt immediately. *Id.* at 1. She further states that she returned to her doctor's office on October 4, 2018, to review bloodwork results, but that she also mentioned her shoulder was sore from the flu vaccination. *Id.* Petitioner stated that Dr. Salter told her the pain should resolve on its own.

## IV. Parties' Arguments

Petitioner requests that I issue a ruling finding that she is entitled to compensation in this case. Mot. at 15-16. She avers that she meets the requirements for a SIRVA as described in the Vaccine Injury Table, and thus is entitled to compensation. Mot. at 7-11. Respondent argues that Petitioner has failed to show she suffered a Table claim because onset of her injury was not within 48 hours of her vaccination. Opp. at 6-7.

## V. Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

6

>   (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A.  Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

#### 1.  Petitioner Had no Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and I find that she has demonstrated a lack of history of pain, inflammation, or dysfunction of her left shoulder that would explain her symptoms. *See* Ex. 5 at 11 (stating that Petitioner was "fine" before her flu shot).

#### 2.  Onset of Petitioner's Injury Occurred within Forty-Eight Hours of her Vaccination

The aforementioned medical records, coupled with Petitioner's witness statements, establish that Petitioner consistently reported to treaters onset close-in-time to vaccination, that she sought treatment within approximately two weeks of her September 2018 vaccination, and that she indeed was experiencing symptoms in the relevant timeframe. Ex. 2 at 7; Ex. 5 at 11-12; Ex. 4 at 23.

Respondent argues that contemporaneous medical records from six days after the vaccination fail to report any shoulder pain or problems. Opp. at 11-12. In support Respondent cites to an October 4, 2018, record wherein Petitioner met with Dr. Salter to discuss bloodwork and lab results. Opp. at 12 citing Ex. 2 at 13. But while Respondent is correct that this single record is silent on Table onset, the totality of the evidence is not. First, the records show that Petitioner sought treatment in a relatively timely manner (*i.e.* less than a month after vaccination). It is common for a SIRVA petitioner to delay seeking

treatment, thinking the injury will resolve on its own, since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. Here, however, the delay was not appreciably long – and the fact that treatment was sought in a relatively short timeframe is supportive of a close-in-time onset.

Second, Petitioner affirmatively and repeatedly linked her shoulder pain to the flu vaccine as early as October 16, 2018, noting that she was still having arm soreness "from flu vaccine received on 9/28/18." Ex. 2 at 7. This reporting provides additional support for onset. Other subsequent medical records also corroborate the contention that Petitioner's pain began within 48 hours of vaccination. *See* e.g., Ex. 5 at 11 (stating "her shoulder pain and stiffness "began after she received a flu shot 2 months ago").

Third, it is reasonable that Petitioner either failed to mention her shoulder pain or, as she states in her affidavit, that she mentioned the pain, but Dr. Salter did not record it at the October 4, 2018, appointment. The appointment was to discuss bloodwork and lab results - another problem that was not the focus or purpose of the meeting may have not occurred or gone unrecorded. And given that SIRVA patients often misapprehend the non-transient nature of their pain, it is reasonable to conclude (especially in light of the subsequent, close-in-time records) that Petitioner may not have yet realized the extent of the problem.

Accordingly, and based upon the above, I find there is preponderant evidence that establishes the onset of Petitioner's left shoulder pain was more likely than not immediate, and thus within 48-hours of vaccination.

### 3. Petitioner's Pain was Limited to her Left Shoulder

I also find that there is a preponderance of evidence that Petitioner's pain was limited to her left shoulder. Respondent does not contest this aspect of Petitioner's claim, and the records consistently report shoulder pain and loss of range of motion in her left shoulder, which is consistent with other SIRVA cases. Petitioner's medical procedures were also limited to her left shoulder. Accordingly, preponderant evidence establishes that Petitioner's pain was limited to her left shoulder.

### 4. There is No Evidence of Another Condition or Abnormality

The last criteria for a Table SIRVA state that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent has not contested that Petitioner meets this criterion, and I find there is no evidence in the record to the contrary. Thus, the record contains

preponderant evidence establishing that there is no other condition or abnormality which would explain the symptoms of Petitioner's left shoulder injury.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in her left shoulder on September 28, 2018, in the United States. Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Ex. 7 at 2; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). The records demonstrate, and Respondent does not contest, that Petitioner suffered the residual effects of her shoulder injury for more than six months and underwent surgical intervention. *See*, *e.g.*, Ex. 17 at 1 (records showing continued sequala as of March 15, 2021); Ex. 6 at 11 (records of Petitioner's arthroscopic surgery). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## VI. Damages

The parties have also briefed damages in this case, which is limited to pain and suffering. Petitioner requests an award of $160,000.00 for actual pain and suffering and $7,193.44 for unreimbursed out-of-pocket expenses. Mot. at 16. Respondent argues that the record only supports an award of $90,000.00 for past pain and suffering. Opp. at 12.

### A. Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion in Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs.*, No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.,* No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.,* No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of that injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, declarations, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

---

[5] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Citing the prior damages decision in *Reed v. Sec'y of Health & Hum. Servs,* No. 16-1670, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for actual pain and suffering), Ms. Hunt requests an award of $160,000.00 for actual pain and suffering. Mot. at 14-15. She asserts that the severity of her injury is comparable to *Reed*. In particular, Petitioner emphasizes that she suffered through the worst part of her SIRVA for seven and a half months prior to undergoing surgery, required physical therapy to supplement the surgery and dimmish residual pain, and ultimately still experiences pain even after her surgery. Mot. at 15. Further, just as in *Reed*, Petitioner's pain has affected her daily life. Mot. at 13-14. Petitioner also notes that this Court has awarded between $120,000.00 and $130,000.00 for past pain and suffering in SIRVA cases involving surgery. *See* Reply at 14-15 n.2.[6]

Respondent, by contrast, submits that an award of $90,000.00 is appropriate for pain and suffering (assuming entitlement is found). Opp. at 10. Respondent argues that Petitioner underwent a moderate amount of treatment consisting of eighteen physical therapy sessions, four steroid injections, and arthroscopic surgery, which was ultimately successful. Opp. at 8-9. Respondent cites to *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $97,500.00 for past pain and suffering) in support of her argument.

Respondent also discussed the large number of proffered awards in SPU cases, awards for shoulder injuries in the traditional tort system which appear to be substantially lower, and a "meeting-in-the-middle" method that Respondent believes is being utilized by the special masters when determining the appropriate amount of damages to be awarded. *Id.* at 9-11 n.1; Appendix A (list of traditional tort system cases). I have addressed and rejected these arguments in previous decisions. *See, e.g.*, *Randazzo v. Sec'y of Health & Hum. Servs.*, No. 18-1513V, 2021 WL 829572, at *4 (Fed. Cl. Feb. 1, 2021) (noting that I have rejected the "meeting-in-the-middle" method, Respondent's argument that amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded, and why I do not give great weight to Respondent's citation to pain and suffering from traditional tort system state court cases).

Based on the medical records, Petitioner suffered a mild-to-moderate SIRVA for approximately fifteen months, with periods of little-to-no pain. Petitioner initially reported arm pain and reduced range of motion on October 16, 2018, approximately three weeks

---

[6] Citing *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956, at (Fed. Cl. Spec. Mstr. May 21, 2020) (awarding $127,500.00 for pain and suffering); *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); *Kelley v. Sec'y of Health & Human Servs.*, No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering).

after her vaccination. Ex. 2 at 7. Her pain increased through for approximately six weeks and was reportedly "8+" until her first cortisone injection on November 27, 2018. Ex. 4 at 24.

The cortisone injection provided significant relief, after which her pain was often reported as mild (2-4 out of 10) over the next eight weeks during ten physical therapy sessions. *See* Ex. 4 at 27 (January 24, 2019, record reporting pain as 3 out of 10); *id.* at 41 (December 20, 2018, physical therapy record reporting pain at 1-3 out of 10). However, Petitioner continued to experience shoulder pain and had a second cortisone injection on February 5, 2019. Ex. 5 at 7. This proved to be effective in reducing her pain, and she did not report any additional pain until at least March 1, 2019, approximately ten weeks later. Ex. 5 at 4.

Petitioner ultimately opted to undergo surgery on April 16, 2018. Ex. 6 at 11. The surgery appeared successful, and her pain was minimal throughout the second course of physical therapy. *See* Ex. 6 at 3 (physical therapy record from June 18, 2019, reporting pain as 1 or 2 out of 10); Ex. 8 at 8 (physical therapy record from July 16, 2019, rating her pain as 1/10). However, Petitioner continued to suffer lingering pain through 2019. *See, e.g.*, Ex. 10 at 2-3 (record from September 9, 2019, reporting constant pain at 5/10 levels); Ex. 12 at 1 (record from October 21, 2019, reporting continued pain); Ex. 13 at 2 (record from November 27, 2019, noting shoulder pain that woke her at night). Petitioner's pain resulted in numerous cortisone injections, which provided some relief. Ex. 13 at 1 (noting Petitioner reported a 50% improvement since her last steroid injection).

I give less weight to reports of Petitioner's discomfort in March of 2021, over one year later. Ex. 17 at 1. At that time, she appeared to be almost completely recovered, however she still reported a slight catch and pain at times and received another cortisone injection. *Id.* The gap in treatment indicates that her pain was mild at worst. Further, it supports the finding that, as of November 2019 Petitioner had largely returned to her baseline condition.

These factors indicate that Petitioner's SIRVA was mild to moderate for the initial six weeks after her vaccination, and mild thereafter. Further, Petitioner's treatment occurred over approximately fifteen months and included surgery, over nineteen physical therapy sessions, an MRI, and three steroid injections.[7]

---

[7] I understand that Petitioner again reported pain in March and April of 2021. But the fifteen-month gap in seeking treatment is evidence that her pain was not significant during this period. Further, at that time she appeared to be almost completely recovered, only reporting a slight catch and pain at times. Ex. 17 at 1.

The overall severity of the injury at issue herein is not high enough to warrant the $160,000.00 requested by Petitioner in her motion. I note that *Reed*, the SIRVA decision cited by Petitioner, is distinguishable as it involved a much higher level of pain over a much longer period of time. The petitioner in *Reed* suffered pain at levels of 6-9 out of 10 while attending more than 13 physical therapy sessions for the six months prior to her surgery and on a level of 3-6 out of 10 while attending 18 physical therapy sessions for four months post-surgery. *Reed*, 2019 WL 1222925, at *3-9, 15. Four months after her surgery, the *Reed* petitioner was forced to seek treatment from a pain management specialist. *Id.* at *6-7. Two years after her injury, the *Reed* petitioner continued to take a strong opioid medication to manage her pain. *Id.* at *9, 11. It is clear from the record that the severity and duration of Petitioner's pain and suffering was significantly less than that suffered by the petitioner in Reed.

I agree with Respondent that this case is most analogous to *Shelton,* 2021 WL 2550093 (awarding $97,500.00 for pain and suffering). As here, petitioner in *Shelton* received several corticosteroid injections, an MRI, numerous physical therapy sessions, and underwent surgery. Further, just as in *Shelton*, Petitioner here made a good recovery after her surgery. The cases are, however, also distinguishable – and in ways that justify a slightly lower award. For example, the petitioner in *Shelton* delayed her initial treatment for approximately five months and showed significant improvement just two months after surgery. However, she also reported more significant pain. *Id.* at *7. In contrast, although Ms. Hunt may have sought treatment more quickly, she also benefited from significant reduction in her pain following each cortisone injection (the first of which she received in November 2018), resulting in periods of little-to-no pain during the course of her injury.

Taking all of the above into account, I find that $95,000.00 for pain and suffering is appropriate in this case. Although it is common in SPU in SIRVA cases featuring a surgery to result in pain and suffering awards in excess of $100,000.00, each case must be resolved on its own terms and based on the specific facts. Here, Petitioner does deserve a pain and suffering award *close to*, but not in excess of, that figure.

### C. Unreimbursed Out-Of-Pocket Expenses

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation ... determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer*, 1996 WL 147722, at *22-23.

Petitioner seeks $7,193.44 for unreimbursed out-of-pocket expenses. Mot. at 16. Petitioner filed Exhibit 18, which provides support for this amount, on May 13, 2022. I find the expenses listed in Exhibit 18 provide support for the amount sought in unreimbursed medical expenses, as they resulted from her vaccine-related injury, were incurred by her (or on her behalf), and otherwise have been demonstrated to be necessary. Therefore, I will include the total sum requested in the final award.

## VII. Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury, specifically shoulder pain, was within 48 hours of her vaccine. Further, based on the evidence of record, I find that Petitioner is entitled to compensation.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$95,000.00 represents a fair and appropriate amount of compensation for Ms. Hunt's actual pain and suffering. I also grant Ms. Hunt's request for $7,193.44 for past unreimbursed medical expenses.**[8] **Petitioner shall therefore be awarded the total sum of $102,193.44, in the form of a check payable to Petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court SHALL ENTER JUDGMENT in accordance with the terms of this Decision.

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).